# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NOAH BANK and EDWARD SHIN | ) | |
| a/k/a EUNGSOO SHIN | ) | |
| | ) | **Civil Action** |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 18-1413-WB** |
| | ) | |
| SUNDAY JOURNAL USA CORPORATION | ) | |
| And Y&L MEDIA, INC., d/b/a SUNDAY | ) | |
| JOURNAL USA, | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT OR, IN THE ALTERNATIVE, TO TRANSER THIS CASE PURSUANT TO 28 U.S.C. 1406(a) TO THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA**

David A. Cohen
Pa. Bar No. 54342
Robert J. Basil (Admitted *pro hac vice*)
The Basil Law Group, P.C.
1270 Broadway, Suite 305
New York, NY 10001
917-512-3066
davidacohen@rjbasil.com
robertjbasil@rjbasil.com
*Attorneys for Plaintiffs Noah Bank*
*And Edward Shin*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................ii

I.      INTRODUCTION ......................................................................1

II.     JURISDICTIONAL FACTS ......................................................3

III.    THIS COURT SHOULD DENY DEFENDANTS' MOTION
       TO DISMISS FOR LACK OF PERSONAL JURISDICTION ......................8

   A.  Standard of Review ......................................................................8

   B.  Test for Specific Jurisdiction ......................................................9

   C.  This Court Has Personal Jurisdiction Over the Defendants
       Under the Traditional Specific Jurisdiction Test ...........................11

       1.     Defendants Purposely Directed Their Activities at Pennsylvania ...............11

       2.     Plaintiffs' Claims Arise Out of Defendants' Forum-Related Activities .........17

       3.     The Exercise of Jurisdiction Would Comport With Notions of
           Fair Play and Substantial Justice ...............................................18

   D.    This Court Has Personal Jurisdiction Over the Defendants
       Under the *Calder* "Effects Test" ......................................18

       1.     The Defendants Allegedly Committed Intentional Torts .........................18

       2.     Plaintiffs Felt the Brunt of the Harm in Pennsylvania ...........................18

       3.     Defendants Expressly Aimed Their Conduct At Pennsylvania ...................20

IV.   THIS COURT SHOULD DENY DEFENDANTS' MOTION TO
       DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM ............20

V.     IN THE ALTERNATIVE TO DISMISSAL OF PLAINTIFFS'
       CASE, THIS COURT SHOULD TRANSFER THIS CASE PURSUANT
       TO 28 U.S.C. § 1406(a) TO THE UNITED STATES DISTRICT
       COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA .....................23

VI.   CONCLUSION ......................................................................25

## TABLE OF AUTHORITIES

**Cases**                                                                           **Page**

*Borel v. Pavichevich*, 2001 WL 1549538 (E.D. Pa. 2001) ……………………………………..24

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) …………………………….…….10,18

*Burnett v. New York Cent. R. Co.*, 380 U.S. 424 (1965) ……………………………….…….23

*Calder v. Jones*, 465 U.S. 783, 790 (1984) ……………………………………………....…9-11

*Corr Medical Care, Inc. v. Gray*, WL 248977 (E.D. Pa. Jan. 30, 2008) …………………...…9

*Curran v. Phila. Newspapers, Inc.*, 376 Pa. Super. 508, 546 A.2d 639 (Pa. Super. 1989) ……..22

*Franklin Prescriptions, Inc. v. The New York Times Co.*,
267 F. Supp. 2d 425 (E.D. Pa. 2003) ………………………………………………………21

*Friedman v. Israel Labour Party*, 957 F. Supp. 701 (E.D. Pa. 1997) ………………………15-17

*Gordy v. The Daily News*, 95 F.3d 829 (9th Cir. 1996) …………………………………………..16

*Grand Entertainment Group, Ltd v. Star Media Sales, Inc.*, 988 F.2d 476 (3d Cir. 1993) ….……10

*Helicopteros Naciolales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984) …………….………..10

*Ikon Office Solutions, Inc. v. Rezente*, 2010 WL 395955 (E.D. Pa. Feb. 3, 2010) ……..……….24

*IMO Industries, Inc. v. Kiekert AG*, 155 F.3d 254 (3d Cir. 1998) …………………………...19,20

*Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945) …………………………………………..10

*Marcone v. Penthouse Int'l*, 754 F.2d 1072 (3d Cir. 1985) …………………………….…….21

*Marten v. Godwin*, 499 F.3d 290, 295-96 (3d Cir. 2007) …………………………………10,11

*McDowell v. Paiewonsky*, 769 F.2d 942, 948 (3d Cir. 1985) …………………………...……..21

*Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324 (3d Cir. 2009) ……………………………..9

*Mellon Bank (East) PSFS Nat. Ass'n v. Farino*, 960 F.2d 1217 (3d Cir. 1992) …………………9

*Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93 (3d Cir. 2004) ……………………………………9

*O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312 (3d Cir. 2007) ………………..9,10,17,18

*Provident Nat. Bank v. Cal. Fed. Sav. & Loan Assoc.*, 819 F.2d 434 (3d Cir. 1987) …………9

*Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264 (3d Cir. 1980) ………………………………21

*Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61 (3d Cir. 1984) ……..……9,16

*Vizant Technologies, LLC v. Whitchurch*, 97 F. Supp. 3d 618 (E.D. Pa. 2015) ……..…….10,11

*Willis v. Green Tree Servicing, LLC*, 156 F. Supp. 3d 121 (D.D.C. 2015) …………………...23

**Statutes**

28 U.S.C. 1391(a) ………………………………………………………………………..24

28 U.S.C. § 1406(a) …………………………………………………………………2,23,25

**Rules**

Fed. R. Civ. P. 12(b)(2) …………………………………………………………………..9,20

**Secondary Authorities**

14D Charles Allan Wright, Arthur Miller, Edward Cooper,
        Federal Practice and Procedure § 3827 (4th ed. 2018) ………………………………23

## I.    INTRODUCTION

Defendants Sunday Journal USA Corporation and Y & L Media, Inc. move to dismiss Plaintiffs' Second Amended Complaint on the ground that this Court lacks personal jurisdiction over the Defendants.  This Court should deny defendants' motion, or in the alternative, transfer this case pursuant to 28 U.S.C. 1406(a), to the United States District Court for the Central District of California.

Plaintiffs, Noah Bank and Edward Shin ("Shin") bought this defamation action on April 4, 2018.  The Second Amended Complaint alleges that Defendants, the owners of Sunday Journal, a Los Angeles-based Korean-language periodical, published four articles in the Korean language that were highly critical of Noah Bank and Shin.  Plaintiffs allege that four defamatory articles, which were published in April, May and November 2017, Sunday Journal falsely reported that Noah Bank and Shin engaged in illegal business practices such as bribery, kickbacks, money laundering, and tax evasion.

Defendants argue that the Court lacks personal jurisdiction over them because Sunday Journal only intended that California residents read its news articles, including the four articles at issue.  Defendants' argument fails for several reasons.  First, the Sunday Journal articles regarding Noah Bank and Shin lack any reference to: (1) a California resident; (2) a California corporation or bank; (3) an institution or corporation that conducts business in California or (4) an incident that occurred within three thousand miles of the State of California.  Nor is there any evidence that Noah Bank or Shin are public figures that would support the proposition that these articles were directed to California.

Second, and more importantly, Y & L Media admitted that only some of Sunday Journal's news articles are published on Sunday Journal's website and on its Twitter account.

This admission is important because if, as Defendants claim, every news article published by Sunday Journal were truly directed only to Sunday Journal's California readers, then all Sunday Journal articles would be published both in print and online.

A logical inference from fact that only "some" articles were selected to be published on Sunday Journal's website or on its Twitter account is that these subsets of Sunday Journal's articles are directed toward Korean-speaking persons outside of California. This inference is corroborated by Sunday Journal's admission that it intends for Korean-speaking individuals to read the on-line version and Twitter versions of Sunday Journal. Thus, the four articles involving Noah Bank and Shin were directed primarily outside of California.

In fact, the record demonstrates that Sunday Journal's articles were purposely directed to Pennsylvania. The articles focused solely on plaintiffs, a Pennsylvania bank and a Pennsylvania resident. Sunday Journal knew, through the materials supplied Dong Lee, a longtime antagonist of Shin's, that Noah Bank was headquartered in Pennsylvania and that Shin resides in Pennsylvania. The fact that the defamatory statements point to conduct that occurred in the Commonwealth is consistent with the motives of Dong Lee, who sought to adversely affect Noah Bank's and Shin's reputation within the Korean-speaking population of Pennsylvania. As a result, this Court may exercise personal jurisdiction over Defendants.

If, however, the Court finds that it lacks personal jurisdiction over the Defendants, it should transfer this case in lieu of dismissal. Under 28 U.S.C. § 1406(a), a court may transfer a case filed in the wrong district, including if personal jurisdiction is lacking, if it is "the interest of justice." Transfer to the U.S. District Court for the Central District of California, the principal place of business for both Defendants, is in the interest of justice because the statute of limitations in both Pennsylvania and California have expired on Plaintiffs' claims.

2

## II.    JURISDICTIONAL FACTS

1.  Defendant Sunday Journal USA Corporation is a California corporation with its principal

    place of business located at 4201 Wilshire Boulevard, Los Angeles, California.  *See*

    Declaration of David Cohen ("Cohen Declaration"), at **Ex. A**.

2.  Defendant Y & L Media, Inc. ("Y & L Media") is a California corporation with its principal

    place of business located at 4201 Wilshire Boulevard, Los Angeles, California.  *See*

    Declaration of Richard Hun Yun, **Ex. A**.

3.  Noah Bank is a Pennsylvania chartered bank headquartered in Elkins Park, Pennsylvania.

    See Declaration of Edward Shin ("Shin Declaration") at ¶9.

4.  Edward Shin is a resident of the Commonwealth of Pennsylvania.  *Id.* at ¶11.

5.  Noah Bank does not have any branches in the State of California.  Noah Bank has never had

    any branches in the State of California.  *Id*. at ¶¶14,15.

6.  No member of the Board of Directors of Noah Bank resides in California.  *Id*. at ¶13.

7.  A substantial number of Noah Bank shareholders reside in Pennsylvania.  *Id.* at ¶28.

8.  There is a substantial Korean-speaking population residing in Pennsylvania.  According to

    the United States Census Bureau, there were more than 47,000 residents of Pennsylvania that

    considered themselves to be "Korean" in response to the Census survey. *See* U.S. Census

    Bureau, 2012-2016 American Community Survey 5-Year Estimates, Pennsylvania (2017);

    attached hereto as **Exhibit B** to Cohen Declaration.

9.  Of that number, approximately 30,000 residents of Bucks, Delaware, Montgomery and

    Philadelphia Counties identified themselves as "Korean" in response to a Census survey. *See*

    U.S. Census Bureau, 2012-2016 American Community Survey 5-Year Estimates,

    Philadelphia County, Pennsylvania (2017); U.S. Census Bureau, 2012-2016 American

Community Survey 5-Year Estimates, Bucks County, Pennsylvania (2017); ); U.S. Census Bureau, 2012-2016 American Community Survey 5-Year Estimates, Chester County, Pennsylvania (2017 U.S. Census Bureau, 2012-2016 American Community Survey 5-Year Estimates, Delaware County, Pennsylvania (2017); U.S. Census Bureau, 2012-2016 American Community Survey 5-Year Estimates, Montgomery County, Pennsylvania (2017); attached hereto as **Exhibit C** to Cohen Declaration.

10. Sunday Journal is a Korean-language newspaper published by Y&L Media from its offices located in Los Angeles, California.   Response to Request to Admit, No. 11; attached hereto as **Exhibit D** to Cohen Declaration.

11. Sunday Journal has a website domain: "sundayjournalusa.com."  Response to Request to Admit, No. 9.  *Id.*

12. Sunday Journal posts some, but not all, of its news articles on the website domain: "sundayjournalusa.com".  Response to Request to Admit, No. 9.  *Id.*

13. Sunday Journal has a twitter account.  Response to Request to Admit, No. 13.  *Id.*

14. Some, but not all, of Sunday Journal's articles are posted on its Twitter account; "@sundayjournal"  Response to Request to Admit, No. 13.  *Id.*

15. Sunday Journal intends for Korean-speaking individuals to read the on-line version of Sunday Journal.  Response to Request to Admit, No. 12.  *Id.*

16. Sunday Journal intends for Korean-speaking individuals to read Sunday Journal articles on Twitter.  Response to Request to Admit, No. 15.  *Id.*

17. On or about April 27, 2017 Sunday Journal posted an article on sundayjournalusa.com concerning Noah Bank and Edward Shin.  Response to Request to Admit, No. 16.  *Id.*

18. On or about May 4, 2017 Sunday Journal posted an article on sundayjournalusa.com

concerning Noah Bank and Edward Shin.  Response to Request to Admit, No. 26.  *Id.*

19. On or about May 18, 2017 Sunday Journal posted an article on sundayjournalusa.com

    concerning Noah Bank and Edward Shin.  Response to Request to Admit, No. 36.  *Id.*

20. On or about November 12, 2017 Sunday Journal posted an article on sundayjournalusa.com

    concerning Noah Bank and Edward Shin.  Response to Request to Admit, No. 46.  *Id.*

21. The author of each of the Sunday Journal articles was Chi-Yong Ahn.  *See* Second Amended

    Complaint, Exs. A-G.

22. The April 27, 2017 Sunday Journal article featured the headline: "Inside story of serious

    injury to Eungsoo Shin, President of Noah Bank, due to an assault at a room salon," reported

    on injuries Shin sustained in an accident that occurred in New York City.  *See* Second

    Amended Complaint, Ex. A.

23. The article included allegations that Shin "has allegedly received some illegitimate

    commission in relation to loans," and that "in 2015, President Shin received a consent order

    from financial supervisory authorities because of the poor bank management and the

    incompetence of the Board of Directors."  Second Amended Complaint, ¶¶ 25-34.

24. The May 4, 2017 article stated that, based upon discussions with an anonymous "a high

    ranking executive of Noah Bank," Shin's injury "has indisputably revealed the internally

    covert matters of a bank and the controversies over property transactions at the core of

    Korean commercial community."  The article then alleged that Noah Bank's and Shin's

    conduct "have escalated to criminal matters, such as tax evasion and money laundering, etc."

    Second Amended Complaint at ¶¶ 38-41.

25. The May 18, 2017 article asserted that Noah Bank approved a mortgage without making any

    mortgage contract.  Second Amended Complaint at ¶ 47.

26. The November 12, 2017 article claimed that Shin accepted a bribe.  Second Amended Complaint at ¶ 54.

27. Chi-Yong Ahn did not contact or interview Ed Shin prior to the publication of any of the articles.  Shin Declaration at ¶17.

28. Chi-Yong Ahn did not contact or interview any employee or officer of Noah Bank prior to the publication of any of his articles in Sunday Journal.  *Id.* at ¶17.

29. Non-party Dong Hyun Lee ("Dong Lee"), or persons acting in concert with Dong Lee, most likely provided Chi-Yong Ahn, the author of the Articles, with the content ultimately published by Sunday Journal in the Articles.  *Id.*  at ¶¶18-20.

30. Dong Lee has been an antagonist of Shin for many years.  Dong Lee has long-sought to damage Shin and Noah Bank by spreading false information to Noah Bank's shareholders, employees, customers, and potential business associates and investors with information similar to that published in Sunday Journal.  *Id.* at ¶25.

31. Shortly after Sunday Journal was served with a summons in this case, on April 19, 2018, counsel for Sunday Journal USA, sent counsel for Plaintiffs several documents that more likely than not came from Dong Lee or persons working in concert with him.  *Id.* at ¶21.

32. These documents included a "civil cover sheet" in a federal case Dong Lee brought against Shin in 2010, and a civil complaint filed in 2014 containing allegations by "DL" (Dong Lee) against Shin relating to a "IPO Scheme" in 2006.  *Id.* at ¶22.

33. Similarly, Sunday Journal's filing with the Court on September 9, 2018, referred to the unsealed Qui Tam complaint filed against Shin and Noah Bank.  *Id.* at ¶23.

34. Shin had no knowledge that the Qui Tam complaint had been unsealed as neither Shin nor Noah Bank had been served.  Sunday Journal's source for its September 9 filing was most

likely Dong Lee.  *Id.* at ¶24.

35. Dong Lee repeatedly sought to damage Noah Bank's and Shin's reputation with Noah Bank's shareholders, employees, customers, potential customers and with potential business associates and investors.  *Id.* at ¶25.

36. Noah Bank has operated successfully since its founding and has enjoyed an excellent reputation for its banking services since its inception, until its reputation was attacked by Sunday Journal.  *Id.* at ¶16.

37. The impact of the Sunday Journal articles was felt almost immediately in Pennsylvania and elsewhere.  *Id.* at ¶27.

38. The Sunday Journal articles were disseminated over the internet to Noah Bank's shareholders in Pennsylvania.  *Id.* at ¶29-30.

39. After the Sunday Journal articles were published on the internet during April and May of 2017, several Korean-speaking shareholders residing in Pennsylvania complained to Shin about the publications and content of the Articles.  *Id.* at ¶29.

40. These Pennsylvania shareholders referred to the accusations in the Sunday Journal Articles in their complaints to Shin, especially the allegations that Noah Bank and Shin were engaging in criminal activity and they expressed their concern to Shin that these Articles were damaging Noah Bank's reputation in the Korean-speaking community.  *Id.* at ¶30.

41. These Noah Bank shareholders were also concerned because they said that the value of their shares of stock in the bank was declining because of the Articles.  *Id.* at ¶31.

42. After the Articles were published on the internet during April, May and November 2017, Noah Bank experienced an unusual spike in its Korean speaking customers

closing their accounts.  *Id.* at ¶32.

43. Korean-speaking customers told Shin that the reason they were closing their accounts was because after reading the Sunday Journal articles they were concerned that they could not trust Shin or Noah Bank with their money.  *Id.* at ¶33.

44. Beginning in 2017, Noah Bank has been seeking to raise additional capital through outside investors.  *Id.* at ¶34.

45. Shin was told by potential investors that they were not going to invest in Noah Bank because of "reputational issues" involving Noah Bank and Shin, which Shin believes arose as a result of the Articles.  *Id.* at ¶35.

46. The damage caused by the publication of the defamatory statements in the Articles to both Shin and Noah Bank occurred primarily in Pennsylvania, and to some degree elsewhere.  *Id.* at ¶36.

47. The market value of Noah Bank's stock fell significantly because of the negative effects of the Sunday Journal Articles on Shin's and Noah Bank's reputation in the Korean community.  *Id.* at ¶37.

48. Falling stock prices injured not only Noah Bank shareholders, but Noah Bank itself. Noah Bank was injured in its ongoing efforts to engage in mergers and acquisitions. In such a transaction, the market price of Noah Bank's shares would determine whether the bank would be able to acquire the shares of the merging or acquired bank, and if so how many.  *Id.* at ¶38.

## III.  THIS COURT SHOULD DENY DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

### A.    Standard of Review

Defendants move to dismiss Plaintiffs' Second Amended Complaint on the ground that

this Court lacks personal jurisdiction over Defendants.  In considering a motion to dismiss under Rule 12(b)(2), the court must accept all allegations in the complaint as true and view all factual disputes in favor of the plaintiff.  When ruling on a Rule 12(b)(2) motion, a court may review affidavits and other evidence submitted by the parties, since it "requires resolution of factual issues outside of the pleadings."  *Corr Medical Care, Inc. v. Gray*, 07-2840, 2008 WL 248977 at *5 (E.D. Pa. Jan. 30, 2008) (quoting *Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61, 66-67 n.9 (3d Cir. 1984).

Once a defendant raises a Rule 12(b)(2) defense, the burden shifts to the plaintiff to "prove by affidavits or other competent evidence that jurisdiction is proper."  *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009).  Where no evidentiary hearing on the jurisdictional issue has been held, "the plaintiffs need only establish a *prima facie* case of personal jurisdiction and the plaintiffs are entitled to have their allegations taken as true and all factual dispute drawn in their favor."  *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 316 (3d Cir. 2007) (citing *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004).

 "The plaintiff meets this burden and presents a *prima facie* case for the exercise of personal jurisdiction by 'establishing with reasonable particularity sufficient contacts between the defendant and the forum state.'"  *Mellon Bank (East) PSFS Nat. Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992) (quoting *Provident Nat. Bank v. Cal. Fed. Sav. & Loan Assoc.*, 819 F.2d 434, 437 (3d Cir. 1987).

### B.    Test for Specific Jurisdiction

Plaintiffs do not allege that this Court has general jurisdiction over the Defendants. Rather, this Court has specific jurisdiction of the Defendants under either the "traditional" specific jurisdiction test or the Supreme Court's "effects test," which is applicable with respect to

intentional tort claims.  *See Calder v. Jones*, 465 U.S. 783, 790 (1984).

In general, a district court analyzing its specific jurisdiction applying the "traditional" test must conduct a three-part inquiry.  *Marten v. Godwin*, 499 F.3d 290, 295-96 (3d Cir. 2007) (citing *O'Connor*, 496 F.3d at 317.  First, "the defendant must have purposefully availed itself of the privilege of conducting activities within the forum."  *O'Connor*, 496 F.3d at 316.  Physical entrance is not required.  *Id.* (citing *Grand Entertainment Group, Ltd v. Star Media Sales, Inc.*, 988 F.2d 476, 482 (3d Cir. 1993)("Mail and telephone communications sent by the defendant into the forum may count toward the minimum contacts that support jurisdiction.").  "But what is necessary is a deliberate targeting of the forum."  *O'Connor*, 496 F.3d at 317.

Second, the plaintiff's claims must also "arise out of or relate to at least one of those contacts."  *Id.* at 318 (quoting *Helicopteros Naciolales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984).  Third, the court must consider "whether the exercise of jurisdiction would otherwise comport with 'traditional notions of fair play and substantial justice.'"  *O'Connor*, 496 F.3d at 324 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  The Supreme Court has identified several factors that courts should consider; including the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, and the interstate judicial system's interest in obtaining the most efficient resolution of the controversy.  *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985).

In addition to the "traditional" three-part test of specific jurisdiction, "the Supreme Court has established a second analysis which is applicable to personal jurisdiction with respect to intentional tort claims."  *Vizant Technologies, LLC v. Whitchurch*, 97 F. Supp. 3d 618, 628 (E.D. Pa. 2015).  In *Calder*, which was "a defamation action, the Court endorsed a test of specific jurisdiction which places emphasis upon the effects of a defendant's actions in the forum state."

*Id.*

In order to establish personal jurisdiction under the *Calder* "effects test," the Third Circuit has held that the following three elements must be satisfied:

> (1) The defendant committed an intentional tort;
>
> (2) The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; [and]
>
> (3) The defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity.

*Marten*, 499 F.3d at 297.

The test established by the *Calder* court, commonly known as the "effects test," is distinct from the traditional three-part traditional jurisdictional inquiry for two key reasons. First, *Calder* applies only to intentional torts. *Vizant*, 97 F. Supp.3d at 629. "Second, and more importantly, the *Calder* test need only be invoked when a district court finds that a defendant lacks sufficient minimum contracts under the traditional test." *Id.*

## C. This Court Has Personal Jurisdiction Over the Defendants Under the Traditional Specific Jurisdiction Test

### 1. Defendants Purposely Directed Their Activities at Pennsylvania

As discussed above, the first prong of the traditional specific jurisdiction test is whether the defendant "purposely directed his activities at the forum." In this case, the record before the Court demonstrates that Defendants did, in fact, purposely directed their activities at Pennsylvania.

Defendants did not submit any affidavits in conjunction with their motion to dismiss.[1] Instead, Defendants rely exclusively upon the declaration of Richard Hun Yun dated June 26,

---

[1] Defendants did not serve Plaintiffs with any jurisdictional discovery.

2018.  In his declaration, Yun stated:

> Sunday Journal USA does not do business in the Commonwealth
> of Pennsylvania.  There are no Pennsylvania subscribers to the
> Sunday Journal USA.  Sunday Journal USA does maintain a
> website (http://sundayjournalusa.com) but does not sell good or
> services via the website, and more specifically, does not target
> businesses or individuals, sell goods or services in Pennsylvania.

Notably absent in Yun's declaration is any statement regarding Defendant Y & L Media.

While Yun alleges that Defendant Sunday Journal USA does not do business in Pennsylvania, no

such allegation is made regarding Defendant Y & L Media, Inc.

Defendants argue in their memorandum that "it is clear that the publication is focused on

the Los Angeles area, California, and the west coast where more than half of the Korean-

American community resides."  Def. Mem. at 3.  Notably absent, however, is any affidavit or

declaration supporting this assertion.

It is undisputed that Noah Bank is a regional, Pennsylvania bank that does not have any

branches or offices in the State of California, and that Noah Bank has never had any branches or

offices in the State of California.   Nor have Defendants introduced any evidence to suggest that

Noah Bank or Shin were "public figures" or "limited public figures" within the State of

California, or that they are known there at all.  As a result, Defendants' claim that its four articles

concerning Noah Bank and Shin were primarily directed to Sunday Journal's readers in

California ring hollow.

In fact, the record demonstrates that the Noah Bank articles at issue in this case were <u>not</u>

directed primarily to Sunday Journal's California readers, who presumably would have no

interest in the happenings at a Pennsylvania regional bank.  Indeed, Defendants identify no

interest that its California readers might have in the articles.

First, the Sunday Journal articles are devoid of any reference to: (1) a California resident;

(2) a California corporation or bank; (3) an institution or corporation that conducts business in California or (4) an incident that occurred within three thousand miles of the State of California.

Second, Y & L Media admitted that while Sunday Journal has a website domain, Sunday Journal selects only some of its published articles for the website.  The same is true regarding Twitter.  Y & L Media admitted that while Sunday Journal has an active Twitter account, Sunday Journal selects only some of its published articles for posting on its Twitter account.  From these admissions this Court should infer that <u>all</u> of Sunday Journal's news articles are published in print form in California, but that it selects only <u>some</u> of its news articles to be published on its website or on its Twitter account for readers in jurisdictions, such as Pennsylvania, where print versions are not readily available.

If, as Defendants claim, every news article published by Sunday Journal were truly directed only to Sunday Journal's California readers, then all Sunday Journal articles would be published both in print and online.  A logical inference from fact that only "some" articles were selected to be published on Sunday Journal's website or on its Twitter account is that these subsets of Sunday Journal's articles are directed toward Korean-speaking persons outside of California.  This inference is corroborated by Sunday Journal's admission that it intends for Korean-speaking individuals to read the on-line version and Twitter versions of Sunday Journal.

In this case, Y & L Media admitted that each of the four news articles published in April, May and November 2017 regarding Noah Bank and Shin were posted on Sunday Journal's website and on its Twitter account.  Thus, these articles were part of the subset of news articles that were selected to be published online and on Twitter for readers outside of California.

Having demonstrated that the four articles at issue were not directed principally to Sunday Journal's California readers, the question then becomes, "To what jurisdiction were these

13

articles primarily directed?"  In order to answer this question, we must look at the content of the articles themselves.

The first Sunday Journal article, which featured the headline: "Inside story of serious injury to Eungsoo Shin, President of Noah Bank, due to an assault at a room salon," reported on injuries Shin sustained in an accident that occurred in New York City.  However, as detailed in the Second Amended Complaint, the defamatory statements in the April 27, 2017 article were directed at Noah Bank's and Shin's conduct in Pennsylvania.  *See* Second Amended Complaint, Dkt. No. 30, ¶¶ 25-34.  These defamatory statements included statements that Shin "has allegedly received some illegitimate commission in relation to loans," and that "in 2015, President Shin received a consent order from financial supervisory authorities because of the poor bank management and the incompetence of the Board of Directors."  These actions would have taken place in Pennsylvania if they had actually occurred.

The same is true of the May 4, 2017 Sunday Journal article.  The May 4 article stated that, based upon discussions with an anonymous "a high ranking executive of Noah Bank," Shin's injury "has indisputably revealed the internally covert matters of a bank and the controversies over property transactions at the core of Korean commercial community."  The article then alleged that Noah Bank's and Shin's conduct "have escalated to criminal matters, such as tax evasion and money laundering, etc."  Second Amended Complaint at ¶¶ 38-41.  Again, these statements are directed at Noah Bank's and Shin's conduct that occurred at Noah Bank's headquarters in Pennsylvania, where Noah Bank's "high ranking executives" would have been available for such anonymous comment.

As stated in the Second Amended Complaint, the May 18 and November 12, 2017 Sunday Journal articles were mostly repetitive of the prior two articles.  However, the May 18

article asserted that Noah Bank approved a mortgage without making any mortgage contract, and the November 12 article claimed that Shin accepted a bribe.  Second Amended Complaint at ¶¶ 47, 54).  These statements were also directed at Noah Bank's and Shin's conduct that allegedly took place in Pennsylvania.  Defendants supply no explanation regarding why Sunday Journal's California readers would possess such strong interests in these Pennsylvania activities that four articles would be justified.

Moreover, there is a substantial Korean-speaking population residing in the Philadelphia, Pennsylvania metropolitan area.  According to the United States Census Bureau, there were more than 47,000 residents of Pennsylvania that considered themselves to be "Korean" in response to a Census survey released in 2017.  Of that number, approximately 30,000 residents of Bucks, Chester, Delaware, Montgomery and Philadelphia Counties identified themselves as "Korean" in the that Census survey.

These are important facts because, unlike most defamation cases, the defamatory statements at issue here were communicated exclusively in the Korean language.  Only Korean-speaking individuals would be capable of reading and understanding the defamatory statements contained in the Sunday Journal articles.  The fact that there is a large Korean-speaking population residing in Pennsylvania dramatically increases the likelihood that the Sunday Journal articles concerning a Pennsylvania bank and its CEO were directed to Pennsylvania.

In a case on point, *Friedman v. Israel Labour Party*, 957 F. Supp. 701 (E.D. Pa. 1997), this Court held that, under the "traditional" specific jurisdiction test, it had personal jurisdiction over Globe Newspaper Company ("Globe," the publisher of the Boston Globe) in a defamation case brought by a Pennsylvania resident.  This Court began its analysis by noting that in order "[t]o determine whether a court has personal jurisdiction over a defendant, it is necessary to

examine the relevant statutes of the forum state.  The Pennsylvania Long Arm Statute allows a court to exercise jurisdiction over a person 'to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States."  *Id.* at 706 (quoting *Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61, 63 (3d Cir. 1984).

In *Friedman*, the plaintiff sued Globe alleging that he was defamed when it published news reports discussing an Israeli Labour Party press release that announced that the Israeli government barred plaintiff and six others from entering the state of Israel.  *Friedman*, 957 F. Supp. at 703.  This Court, applying the first prong of the specific jurisdiction test, found that "Globe's actions were [ ] targeted at Pennsylvania.  Globe's article was about plaintiff and six others, three of whom are residents of Pennsylvania."  *Id.* at 708.  This Court reasoned that "Globe knew when it allegedly defamed plaintiff that at least one of the targets of the article lived in Philadelphia, Pennsylvania" and that "Globe had good reason to expect that a substantial impact of its allegedly defamatory article would be felt in Pennsylvania where the article was distributed."  *Id.*

This Court also rejected Globe's argument that because there were less than 25 subscribers to the Boston Globe in Pennsylvania, Globe did not purposefully avail itself of jurisdiction in the Commonwealth.  *Id.*  This Court relied upon in a similar case before the Ninth Circuit, *Gordy v. The Daily News*, 95 F.3d 829, 831 (9th Cir. 1996).  In *Gordy*, the Court of Appeals concluded that the defendant New York Daily News had sufficient minimum contacts with California to support the exercise of personal jurisdiction there, despite the fact that the newspaper had distributed only 13 to 18 copies its newspaper in California.  *See Id.*  The *Friedman* court held that while the Boston Globe had very few Pennsylvania subscribers, "Globe

purposefully availed itself of Pennsylvania." *Friedman*, 957 F. Supp. at 708.

The facts in this case are very similar to those in *Friedman*. Here, Sunday Journal's articles were focused solely on plaintiffs, a Pennsylvania bank and a Pennsylvania resident. Sunday Journal knew, through the materials supplied Dong Lee, that Noah Bank was headquartered in Pennsylvania and that Shin resides in Pennsylvania. Moreover, as described above, the defamatory statements published by Sunday Journal, especially those involving allegations of criminal conduct such as bribery, money laundering, kickbacks and tax evasion, all would have necessarily taken place in Noah Bank's headquarters in Pennsylvania. The fact that the defamatory statements point to conduct that occurred in the Commonwealth is consistent with the motives of Dong Lee, who sought to adversely affect Noah Bank's and Shin's reputation within the Korean-speaking population of Pennsylvania.

Finally, the fact that there are no Pennsylvania subscribers to Sunday Journal does not, in and of itself, divest this Court of jurisdiction. Given that the articles at issue were disseminated through the internet and Twitter, there is no relevance to the number of subscribers. Indeed, there is no evidence that Sunday Journal articles were only available to subscribers, as Defendants admitted when they chastised Plaintiffs' counsel in an earlier filing for not combing the Sunday Journal website more carefully before effecting service. As a result, this Court should find that the Defendants purposefully directed their defamatory activities at Pennsylvania.

2.   Plaintiffs' Claims Arise Out of Defendants' Forum-Related Activities

The Third Circuit has held that courts should "approach each case individually and take a realistic approach." *O'Connor*, 496 F.3d at 320. In this case, as in *Friedman*, "there is little doubt that plaintiff[s'] claim arises out of defendants' forum-related activities." *Friedman*, 957 F. Supp. at 708. Here, the primary forum-related activity was the dissemination in Pennsylvania

of allegedly defamatory articles, the effect of which was felt in Pennsylvania, the Plaintiffs'

home state.  *See Id.*

   3. <u>The Exercise of Jurisdiction Would Comport With Notions of Fair Play</u>
     <u>and Substantial Justice</u>

  "The existence of minimum contacts makes jurisdiction presumptively constitutional, and

the defendant 'must present a compelling case that the presence of some other considerations

would render jurisdiction unreasonable." *O'Connor*, 496 F.3d at 324 (quoting *Burger King*, 471

U.S. at 477).  While Defendants are burdened by litigating this case in Pennsylvania, such a

burden is not "compelling."  *See O'Connor*, 496 F.3d at 325.  Defendants made their

publications available to thousands of Korean-speaking residents of Pennsylvania over the web

and Twitter.  Thus, this Court should find that it may exercise personal jurisdiction over the

Defendants under the tradition specific jurisdiction test.

  **D.** **This Court Has Personal Jurisdiction Over the Defendants Under the *Calder***
    **"Effects Test"**

  In the alternative, should this Court find that Defendants lack sufficient minimum

contacts under the traditional test, this Court should determine whether jurisdiction may be

exercised over the Defendants under the *Calder* "effects test."

   1. <u>The Defendants Allegedly Committed Intentional Torts</u>

  The first prong of the *Calder* effects test requires the plaintiff to show that the defendant

committed an intentional tort.  In this case, the Second Amended Complaint alleges that

Defendants are liable for defamation and false light.  Both causes of action allege that

Defendants committed an intentional tort.  Thus, the first prong of the *Calder* test is satisfied.

   2. <u>Plaintiffs Felt the Brunt of the Harm in Pennsylvania</u>

  The second prong of the *Calder* test requires the plaintiff to show that "[t]he plaintiff felt

the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort." *See IMO Industries, Inc. v. Kiekert AG*, 155 F.3d 254, 265-66 (3d Cir. 1998).

Here, the facts demonstrate that Plaintiffs felt the brunt of the harm in Pennsylvania such that Pennsylvania can be said to be the focal point of harm suffered by the Plaintiffs as a result of Defendants' tortious conduct. Indeed, after the Sunday Journal articles were published on the internet during April and May of 2017, several Korean-speaking shareholders residing in Pennsylvania complained to Shin about the publications and content of the Articles.

The harm suffered by Plaintiffs in Pennsylvania manifested itself in several ways. First, the allegations contained in the Sunday Journal articles, especially the allegations that Noah Bank and Shin were engaging in criminal activity, damaged Noah Bank's reputation in the Korean-speaking community in Pennsylvania.

Second, Sunday Journal's articles caused the value of Noah Bank's stock to decline. The decline in Noah Bank's stock price adversely effected the bank's ability to raise capital or to effectuate any merger where the bank's stock would be used to purchase the stock of the merger partner.

Third, Noah Bank had been seeking to raise additional capital through outside investors. Shin was told by potential investors that they were not going to invest in Noah Bank because of "reputational issues" involving Noah Bank and Shin as a result of the Articles.

Finally, the damage caused by the publication of the defamatory statements in the Articles to Shin occurred in Pennsylvania where he resides. The decline in Noah Bank's stock price detrimentally affected Shin's personal finances. At the same time,

the negative effects of the Sunday Journal Articles on Shin's reputation affected Shin's reputation in the Korean-American community in Pennsylvania.

As such, Plaintiffs have demonstrated that they felt the brunt of the harm from Defendants' tortious conduct in Pennsylvania.

3.   The Defendants Expressly Aimed Their Conduct At Pennsylvania

The third prong of the *Calder* test requires the plaintiff to show that the defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity.  *See IMO Industries,* 155 F.3d at 266.

Plaintiffs, in argument section III C(1) of this memorandum explained in detail how Defendants expressly aimed their tortious conduct at Pennsylvania.  Plaintiffs incorporate that argument section here.

As a result, this Court should find that it may exercise personal jurisdiction over the Defendants.

**IV.   THIS COURT SHOULD DENY DEFENDANTS' ARGUMENT THAT PLAINTIFFS' COMPLAINT MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM**

Defendants argue that the Second Amended Complaint fails to state a claim for defamation because Plaintiffs are "public and/or quasi-public" figures.[2]  Defendants' argument fails for several reasons.

First, Defendants present no evidence to support their allegation that Noah Bank and Shin are public or "quasi-public" figures "within the Korean community or elsewhere.  There is not even a claim in the declaration of Richard Hun Yun that plaintiffs are public figures or limited purpose public figures, and that affidavit is the sole evidence submitted by Defendants.

---

[2] Out of an abundance of caution, plaintiffs address Defendants' *argument* that the complaint be dismissed as a *motion* actually filed pursuant to Fed. R. Civ. P. 12(b)(6), rather than merely a contention imbedded in their Fed. R. Civ. P. 12(b)(2) motion.

Whether Noah Bank and Shin are public or limited public figures is a question of law to be determined by the Court. *Marcone v. Penthouse Int'l*, 754 F.2d 1072 (3d Cir. 1985). "As a general rule, those who attain public figure status have either assumed roles of special prominence in society or placed themselves in the forefront of a particular issue." *Franklin Prescriptions, Inc. v. The New York Times Co.*, 267 F. Supp. 2d 425, 436 (E.D. Pa. 2003) (citing *Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 273 (3d Cir. 1980). Indeed, it is "exceedingly rare that one is considered a public figure when they have exercised no purposeful action on their part." *Franklin*, 267 F. Supp.2d at 436. Thus, "public figures effectively have assumed the risk of potential unfair criticism by entering into the public arena and engaging the public's attention." *Marcone*, 754 F.2d at 1081.

In this case, there is no evidence that Noah Bank or Shin have exercised any purposeful action on their part to enter the public arena or engage the public's attention. In the absence of any such evidence, this Court should find that Plaintiffs are not public figures.

Similarly, Defendants have failed to prove that Plaintiffs are limited purpose public figures. The Third Circuit has set forth a two-part test to determine whether a plaintiff is a limited purpose public figure. First, a court must determine whether the alleged defamatory communication involves a public controversy. *McDowell v. Paiewonsky*, 769 F.2d 942, 948 (3d Cir. 1985). Second, a court must inquire into the nature and extent of plaintiff's involvement within that controversy. *Id.*

In this case, the Sunday Journal articles do not involve a public controversy. In *Franklin Prescriptions*, defendant argued that plaintiff, by advertising over the internet, placed itself in the public controversy surrounding the Internet's ability to make drugs more affordable. *Franklin*, 267 F. Supp.2d at 437. Here, the Sunday Journal articles do not involve a public controversy,

and instead are focused solely on Noah Bank and Shin.  As a result, Plaintiffs are not limited

purpose public figures and Plaintiffs are not required under Pennsylvania law to prove actual

malice.

However, even if this Court were to find that Plaintiffs were public figures, Plaintiffs

have stated a claim for defamation.  The Pennsylvania Superior Court has held that "the term

'reckless disregard' is not amenable to one infallible definition.  It is a term which is understood

by considering a variety of factors in the context of an actual case.  Such factors may be whether

the author published a statement in the face of verifiable denials . . . and without further

investigation or corroboration, where allegations were clearly serious enough to warrant some

attempt at substantiation." *Curran v. Phila. Newspapers, Inc.*, 376 Pa. Super. 508, 546 A.2d 639,

642 (Pa. Super. 1989).

Here, the Second Amended Complaint alleges that Defendants published defamatory

statements either knowing that they were false or with reckless disregard for the truth.  Second

Amended Complaint at ¶80.  The complaint alleged that:

> The Articles failed to identify the name of any individual source
> for the Articles.  The Articles contained no indication that Sunday
> Journal ever attempted to contact numerous witnesses who would
> have been a position to correct these false reports in the Articles, or
> thereafter.
>
> Sunday Journal made no attempt to contact Shin or Noah Bank
> prior to publishing any of the Articles.

*Id.* at 81-82.  Thus, Plaintiffs have adequately alleged that Defendants published defamatory

statements with reckless disregard for the truth and have stated a claim for defamation under

Pennsylvania law.  Accordingly, this Court should deny Defendants' motion to dismiss for

failure to state a claim.

**V.      IN THE ALTERNATIVE TO DISMISSAL OF PLAINTIFFS' CASE, THIS COURT SHOULD TRANSFER THIS CASE PURSUANT TO 28 U.S.C. § 1406(a) TO THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA**

If this Court determines that it lacks personal jurisdiction over Defendants, Plaintiffs request, in lieu of dismissing the action, that this Court transfer this case to the United States District Court for the Central District of California, which is the district in which both Defendants are located.

28 U.S.C. § 1406(a) provides that "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or it be in the interest of justice, transfer such case to any district or division in which it could have been brought."

"A prerequisite to invoking Section 1406(a) is that the venue chosen by the plaintiff is improper.  This is made clear by the terms of the statute itself, which speaks of 'a case laying venue in the wrong division or district' and, not surprisingly, the federal courts have construed the words accordingly."  14D Charles Allan Wright, Arthur Miller, Edward Cooper, Federal Practice and Procedure § 3827 (4th ed. 2018).

"In most cases of improper venue, the courts conclude that it is in the interest of justice to transfer to a proper forum rather than to dismiss the litigation.  The reasons for doing so are especially compelling if the statute of limitations has run since the commencement of the action, so that dismissal might prevent the institution of a new suit by the plaintiff and a resolution on the merits."  *Id. See also Willis v. Green Tree Servicing, LLC*, 156 F. Supp. 3d 121, 123 (D.D.C. 2015)("The decision to transfer is committed to the sound discretion of the Court, but the interest of justice generally favors transferring a case to an appropriate forum"); *Burnett v. New York Cent. R. Co.*, 380 U.S. 424 (1965) ("Numerous cases hold that when dismissal of an action for

improper venue would terminate rights without a hearing on the merits because plaintiff's action would be barred by a statute of limitations, 'the interests of justice' requires that the case be transferred); *Borel v. Pavichevich*, 2001 WL 1549538, *3 (E.D. Pa. 2001)(Court transferred suit to avoid "possible statute of limitations problems.").

Here, the statute of limitations prevents Plaintiffs from filing a second action.  The statute of limitations for defamation is one year in both Pennsylvania and in California.  Given that the Sunday Journal articles at issue were published in April, May and November 2017, the statute of limitations would preclude re-filing this action if this Court were to dismiss the case.  Thus, this Court should transfer this case to another district rather than dismissing Plaintiffs' case.

Where, as in this case, jurisdiction is founded solely on diversity of citizenship pursuant to 28 U.S.C. 1391(a), there can only be three proper venues where the case can be brought: (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred . . . . or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought."  *See Ikon Office Solutions, Inc. v. Rezente*, 2010 WL 395955, *2 (E.D. Pa. Feb. 3, 2010).

In this case, an alternative venue exists in the Central District of California, which encompasses the City of Los Angeles, where both Defendants are located.  Indeed, according to Richard Hun Yun's declaration, Y & L Media, Inc.is a California corporation with its principal place of business located at 4201 Wilshire Boulevard, Los Angeles, California.  Sunday Journal USA Corporation is also a California corporation with its principal place of business located at 4201 Wilshire Boulevard, Los Angeles, California.

Thus, if this Court determines that it lacks personal jurisdiction over the Defendants, this Court should transfer this action, in lieu of dismissal, to the United States District Court for the Central District of California.

## VI.    CONCLUSION

For the reasons set forth above, Plaintiffs Noah Bank and Edward Shin respectfully request that this Court deny Defendants' motion to dismiss Plaintiffs' Second Amended Complaint for lack of personal jurisdiction and for failure to state a claim, or in the alternative to dismissal of this action, to transfer this case pursuant to 28 U.S.C. § 1406(a) to the United States District Court for the Central District of California, and enter the attached proposed order.

Dated: November 7, 2018                          Respectfully submitted,

                                                  /s/ David A. Cohen_____
                                                 David A. Cohen
                                                 Pa. Bar No. 54342
                                                 Robert J. Basil (admitted *pro hac vice*)
                                                 The Basil Law Group
                                                 1270 Broadway
                                                 Suite 305
                                                 New York, NY 10001
                                                 Phone: (917) 512-3066
                                                 davidacohen@rjbasil.com
                                                 robertjbasi@rjbasil.com
                                                 *Attorneys for Plaintiffs*
                                                 *Noah Bank and Edward Shin*